■ In the Matter of RAYMOND CASTRO, Appellant, v DORA SCHRIRO, Correction Commissioner of the New York City Department of Correction, et al., Respondents. [34 NYS3d 44]—

Judgment, Supreme Court, New York County (Carol E. Huff, J.), entered August 21, 2014, denying the petition seeking to annul respondents' determination, dated July 19, 2013, which terminated petitioner's employment as a probationary correction officer, and granting respondents' cross motion to dismiss the proceeding brought pursuant to CPLR article 78, reversed, on the law, without costs, the petition reinstated, and the matter remanded to Supreme Court for further proceedings.

Petitioner Raymond Castro commenced this article 78 proceeding to contest respondent New York City Department of Correction's (DOC) termination of his employment as a probationary correction officer. His termination occurred after an inmate died because petitioner's superior, a captain, thwarted the efforts of several people, including Officer Castro, to assist the inmate with his medical condition. Officer Castro cooperated in the investigation of the inmate's death and the federal prosecution of his superior. As fully detailed below, on the present record, Officer Castro's conduct, both in response to the inmate's medical emergency and during the investigation of the inmate's death, appears appropriate. Likewise, Officer Castro's termination, without an explanation, appears questionable and in bad faith. Under the circumstances, this Court is unable to conclude that his claim of wrongful termination as a probationary correction officer is without foundation to warrant a pre-answer dismissal based solely on the ground that it fails to state a cause of action.

### Factual Background

In this pre-answer context, the essential facts are strictly gathered from the petition. Because this case arises on a motion to dismiss this article 78 petition under CPLR 3211, we take the facts alleged by petitioner to be true. Where the allegations are ambiguous, we resolve the ambiguities in petitioner's favor.

The verified petition states that on August 17, 2012, Officer Castro was assigned to the Mental Health Assessment Unit (MHAU) at the George R. Vierno Center (GRVC) on Rikers Island. Officer Castro's shift began at 3:00 p.m. and ended at 11:00 p.m. The MHAU is a unit to which DOC sends inmates who are under mental observation and have a disciplinary history. These particular inmates are sent there for housing in traditional cells.

On that day, Officer Castro was assigned to housing area 11A, which had 25 cells, and was on the first tier. A second officer was assigned to another section of housing area 11A, which also had 25 cells but was on the second tier. During Officer Castro's tour, there was one supervising captain for his area. Officer Castro's duties included the care, custody, and control of the inmates therein. To those ends, Officer Castro regularly toured the area where the inmates were housed.

At some point during his 3:00 p.m. to 11:00 p.m. shift, as Officer Castro toured the cells, inmate Echevarria, who was in his cell, told Officer Castro that he swallowed a soap ball, which contained bleach, and that he wanted to get medical attention. Officer Castro immediately informed the officer assigned to the "bubble" or watch post of what the inmate said. Officer Castro could only inform the bubble officer of the situation because Officer Castro's post did not have a phone. That second officer (the bubble officer) informed Officer Castro that the captain was about to tour the area.

Moments later, Captain Pendergrass and Officer Castro met at the housing area 11A desk. There, Officer Castro informed his superior of what Echevarria had said. Officer Castro did this in order to obtain permission from Captain Pendergrass to contact medical staff, or to otherwise obtain instruction from him. Captain Pendergrass instructed Officer Castro that there was no need to contact medical staff. Instead, Captain Pendergrass told Officer Castro, "[D]on't call me if you have live, breathing bodies. Only call me if you need an extraction, or if you have a dead body. Tell him [the inmate] to hold that" (second alteration in petition).

Sometime thereafter, Officer Castro began another tour of the area. During this second tour, Officer Castro noticed vomit in Echevarria's cell. Again, Officer Castro informed his superior, Captain Pendergrass, of his observations. At the time, Captain Pendergrass was inside of the bubble. Again, Captain Pendergrass instructed Officer Castro to tell the inmate to "[h]old it" (alteration in petition).

Within one hour thereafter, a pharmacy technician and her

escort officer began medical rounds to provide certain inmates with medication. The pharmacy technician informed Officer Castro that she noticed that Echevarria needed medical attention. Officer Castro informed the technician that he would notify the Captain, and that she should do the same as well. Officer Castro then went to Captain Pendergrass along with the escort officer. The escort officer, Officer Lizarte, informed Captain Pendergrass that the inmate claimed he ingested a soap ball with bleach and needed medical attention. Captain Pendergrass ordered Officer Lizarte to write a report. At that time, Officer Castro attempted to contact medical staff, but could not find the medical number on an old and faded phone contact list. The phone that Officer Castro attempted to use was in the bubble. Captain Pendergrass approached Officer Castro and asked, "[D]id you contact anyone of significance." Officer Castro informed his superior that he was looking for the extension number to the medical staff. Captain Pendergrass then ordered Officer Castro to take his post. Officer Castro again informed him that he was looking for the medical number. Captain Pendergrass then said, "I am giving you a direct order to take your post." Officer Castro complied with the captain's order.

After Officer Castro manned his post, Officer Lizarte arrived at Officer Castro's desk with a blank report form, and began to write his report. Moments later, Captain Pendergrass asked Officer Lizarte if he was sure he had heard the inmate correctly. Officer Lizarte responded, "[Y]es." Captain Pendergrass then said, "I believe you heard him incorrectly. I just spoke to the nurse and she did not hear that at all." Captain Pendergrass then ordered Officer Lizarte to follow him, and they left the area.

At some point thereafter, Officer Castro noticed that Captain Pendergrass went to Echevarria's cell, remained there for a few seconds, and then left the area. Officer Castro was relieved of his post at 11:30 p.m. The next day, another officer informed Officer Castro that Echevarria was found dead in his cell in the morning, many hours after Officer Castro had been relieved of his post.

In the days and months after the incident, Officer Castro was ordered to verbally inform DOC of his involvement with Echevarria, and then was interviewed by the DOC, the United States Attorney's Office for the Southern District of New York, the City's Department of Investigation, and the New York County's District Attorney's Office. Eventually, in May 2014, Captain Pendergrass was federally indicted. In December 2015,

Pendergrass was convicted of violating inmate Echevarria's Civil Rights under the Due Process Clause of the 14th Amendment of the United States Constitution. In July 2015, he was sentenced to five years in prison.

Meanwhile, in July 2013, Officer Castro was terminated from his employment as a probationary correction officer. After exhausting his administrative remedies, Officer Castro commenced this article 78 proceeding seeking an order annulling DOC's determination. Prior to serving an answer, DOC moved to dismiss the petition, contending only that petitioner had failed to state a cause of action. Supreme Court granted the motion and dismissed the petition. This appeal ensued.

## Discussion

A probationary employee may be dismissed for almost any reason, or for no reason at all, and the employee has no right to challenge the termination in a hearing or otherwise, absent a showing that he or she was dismissed in bad faith or for an improper or impermissible reason (*see Matter of Swinton v Safir*, 93 NY2d 758, 762-763 [1999]). The burden falls on the petitioner to demonstrate by competent proof that bad faith exists, or that the termination was for an improper or impermissible reason (*see Matter of Che Lin Tsao v Kelly*, 28 AD3d 320, 321 [1st Dept 2006]).

This case presents the unique procedural scenario where DOC sought to dismiss this article 78 petition at the pre-answer stage on the sole ground that the petition fails to state a cause of action. We disagree with Supreme Court's determination that the petition fails to sufficiently state a claim of improper termination of a probationary correction officer. On the contrary, petitioner alleges that his termination was arbitrary and capricious, and in bad faith. In addition, petitioner provides a factual predicate for his allegations. In sum and substance, the petition avers that despite serving as a correction officer who acted in complete accord with DOC's rules and proper protocol, pursuant to orders from his supervisor, and in full cooperation with the investigation of inmate Echevarria's death, which lead to Captain Pendergrass' indictment, Officer Castro was inexplicably terminated.

For instance, with regard to his activities in response to the inmate's statement that he had harmed himself by swallowing a soap ball, Officer Castro alleges that he acted pursuant to "normal protocol" and that he was "trained to [ ] contact a supervisor in these situations." Similarly, with regard to his activities in response to his observation of the inmate's vomit, Officer Castro alleges that he acted "pursuant to the protocol . . . of inform[ing] his superior, Captain Pendergrass, of his

observations." Moreover, with regard to his return to his post after attempting unsuccessfully to contact medical personnel, Officer Castro alleges that he was acting in "compli[ance] with his captain's order." Significantly, to support his allegation that these actions were made pursuant to and consistent with DOC rules and proper protocols, petitioner cites to DOC rules 610.030 and 7.05.090 and DOC Directives 4516 (IV) (A) and 5001R (III), (IV) (A) and (V).* Finally, not knowing the reason for his termination, petitioner surmises dubitably that, "[u]pon information and belief, [he] was terminated for some 'misconduct' surrounding the death of inmate Echevarria," for which only the captain was prosecuted and convicted. Considered as a whole, these uncontradicted allegations present a substantial issue of bad faith—namely, whether petitioner's discharge was unrelated to work performance—sufficient to require a denial of the pre-answer motion to dismiss.

In this appeal, however, DOC makes no attempt to refute or let alone shed light on these allegations; DOC simply argues that, as a probationary employee, Officer Castro was not required to be furnished with the charges against him and could have been dismissed without a reason (*see Matter of Swinton v Safir*, 93 NY2d at 762-763; *Matter of York v McGuire*, 63 NY2d 760, 761 [1984]). Petitioner's situation, however, is an exception to this general principle. Where a substantial issue of bad faith is raised, as here, in that the termination of the probationary employment may not have been the result of the petitioner's failure to perform his or her duties satisfactorily but may have been due to some improper basis, a petition should not be dismissed on the pleadings (*cf. Matter of Higgins v La Paglia*, 281 AD2d 679 [3d Dept 2001] [a hearing was directed regarding the termination of a probationary correction officer where an issue was raised as to good faith because of, inter alia, conflicting evaluation reports], *appeal dismissed* 96 NY2d 854 [2001]; *Matter of Ramos v Department of Mental Hygiene of State of N.Y.*, 34 AD2d 925 [1st Dept 1970] [a hearing was directed because a substantial issue had

---

* In his petition, Officer Castro gives a summary explanation of these rules and directives. He explained as follows: "DOC Rule 6.10.030 requires a correction officer to inform a captain when he believes an inmate may harm himself (e.g. swallow soap to harm himself). DOC Rule 7.05.090 . . . requir[es] a correction officer to inform his captain of any abnormal conditions that may indicate suicidal tendencies). Likewise, and more to the point, DOC Directive 4516 (IV) (A) requires the Petitioner to inform his captain of an inmate's complaint of an injury. And, DOC Directive 5001R (III), (IV) (A), and (V) further require the tour commander (captain) to notify the proper authorities regarding an inmate's illness" (citations omitted).

been raised regarding whether the probationary employee's discharge was in reality the result of a personality conflict with a supervisor]).

The dissent gratuitously accuses the majority of "giving lip service" to the law applicable to probationary employees. What the dissent turns a blind eye to and wishes us to ignore is the fact that an employee has the right to challenge a termination when it appears to be based on bad faith or for an improper or impermissible reason (see Matter of Swinton v Safir, 93 NY2d at 763). Thus, when a termination is putatively related to work-related deficiencies, one would expect an agency like DOC to refute contrary allegations or, if true, to provide an explanation of the work-related deficiencies. Here, however, DOC presents nothing other than a pre-answer motion to dismiss based on the sole ground that the petition fails to state a claim of improper termination. At the very least, DOC, the firing agency, should be required to provide responsive pleadings so as to explain the basis of the termination. Of course, ultimately, the burden falls squarely on petitioner to demonstrate by competent proof at an evidentiary hearing that his termination was for an improper or impermissible reason.

The dissent's argument that the petition fails to state a claim of improper termination is not persuasive. In fact, the dissent completely misconstrues and mischaracterizes petitioner's conduct surrounding the death of inmate Echevarria as "just following orders." Likewise, the dissent mischaracterizes the majority's position as viewing any possible DOC finding of misconduct by Officer Castro as a possible "mistake." The dissent's characterization is disingenuous. We simply hold that, at this stage of the proceedings, where DOC has not answered the petition, we are not willing to speculate as to whether petitioner's or DOC's actions were inappropriate under any standard.

Rather, at this juncture, we construe the petition in the light most favorable to petitioner, as required on a pre-answer motion to dismiss. The reasonable inferences to be drawn from petitioner's factual allegations belie the dissent's conclusion that Officer Castro's conduct surrounding the inmate's death was "gross indifference" to the inmate's safety and constitutional rights. Indeed, without basis in fact, the dissent belittles petitioner's apparently sincere efforts to assist the inmate, by among other things, repeatedly informing his superior and attempting to call medical personnel. Moreover, the dissent minimizes the fact that at the time the captain thwarted petitioner's efforts to assist the inmate, the pharmacy techni-

cian, who presumably had medical training and direct access to medical personnel, the escort officer, who was directed to complete an accident report, and the bubble officer, were all alerted to and involved in the inmate's situation. Under the circumstances, the dissent's ominous conclusions—that petitioner was fully aware that his failure to take any further and immediate action, in contravention of his superior's efforts, would lead to the inmate's death—dehors the record and is pure speculation.

In short, at no time during these proceedings has anyone—other than the dissent—characterized petitioner's activities surrounding the inmate as a callous indifference to Echevarria's safety and constitutional rights. Concur—Acosta, J.P., Renwick, Andrias and Moskowitz, JJ.

Andrias, J., dissents in a memorandum as follows: While giving lip service to the law governing the discharge of a probationary employee, the majority in fact finds that the petition should not have been dismissed because it cannot be determined at this juncture whether petitioner's or respondents' actions were "inappropriate under any standard," and any finding of misconduct on petitioner's part may have been a mistake However, a probationary employee may be dismissed for almost any reason, or for no reason at all, and the majority utterly ignores petitioner's total failure to carry his heavy burden of establishing by competent evidence that his termination was motivated by bad faith or for any other improper reason.

Particularly, at the heart of petitioner's challenge is his claim that he did not do anything wrong because he adhered to respondent Department of Correction's (DOC) protocol and was just "following his [c]aptain's orders" when he failed to obtain medical aid for Jason Echevarria, an inmate in his care, whose condition progressively worsened after he ingested a toxic "soap ball" containing bleach. The "just following orders" defense has long been discredited by international institutions and tribunals; similarly, it has no place whatsoever in this state's twenty-first century jurisprudence, and a rejection of the defense by respondents would certainly not be tantamount to bad faith.

Petitioner also cherry picks from DOC regulations, relying on provisions relating to reporting obligations, and ignoring the regulations which establish that a correction officer's primary duty is to ensure the health and safety of his or her charges. In contravention of that duty, during his shift, the only action taken by petitioner was to report Echevarria's

condition to Pendergrass. Furthermore, the hollowness of his "I tried to help, but the captain prevented me" defense is glaringly illustrated by his conduct at the end of his tour when he failed to summon medical personnel, contact a deputy warden, call 911 or otherwise sound the alarm, even though nothing prevented him from doing so at that time. Rather, he simply went home, leaving Echevarria in distress in his cell.

Consequently, for these reasons, and those that follow, I respectfully dissent.

According to the petition, on August 17, 2012, during his 3:00 p.m. to 11:00 p.m. shift, petitioner was touring his assigned area in the Mental Health Assessment Unit at Rikers Island when Echevarria told him that he had ingested the toxic soap ball and requested medical attention. Petitioner advised his supervisor, Captain Terrence Pendergrass, of the situation and Pendergrass responded that there was no need to contact medical and that he should contact Pendergrass only "if [he] need[ed] an extraction, or if [he] ha[d] a dead body." Petitioner complied.

Later in his tour, petitioner noticed vomit in Echevarria's cell. He reported his observation to Pendergrass, who essentially told him to "hold it." Once again, petitioner complied and took no further action to aid Echevarria. Later that evening, a pharmacy technician and an escort officer also saw the vomit in Echevarria's cell and the technician told petitioner that Echeverria needed medical help. Petitioner and the escort officer reported this to Pendergrass, who told the escort officer to fill out a report. However, when petitioner started to look for the telephone number for medical support, but purportedly could not find it "on a[n] old and faded phone contact list," Pendergrass ordered him to return to his post immediately and to not contact anyone. Petitioner again complied without protest and made no further effort to obtain medical care for Echevarria, or to contact Pendergrass's superiors, during the remainder of his shift or after his shift had ended. When petitioner returned the next morning, he learned that Echevarria had died.

Following investigations by DOC, the New York City Department of Investigation, the office of the District Attorney of the county concerned, and the United States Attorney for the Southern District of New York, petitioner's probationary employment was terminated on July 19, 2013. Pendergrass was criminally charged and subsequently convicted in federal court of violating Echevarria's civil rights and sentenced to five years in prison.

Petitioner alleges that respondent's decision to terminate his probationary employment, "[u]pon information and belief, . . . for some 'misconduct' surrounding the death of a Inmate [Jason] Echevarria," "was affected by an error of law, arbitrary and capricious, and/or an abuse of discretion." This argument misapprehends the governing principle of law that a probationary employee may be discharged for "almost any reason, or for no reason at all," without a hearing and without a statement of reasons, as long as it is not "in bad faith or for an improper or impermissible reason" (*Matter of Swinton v Safir*, 93 NY2d 758, 762-763 [1999]; *see also Matter of Smith v New York City Dept. of Correction*, 292 AD2d 198, 198-199 [1st Dept 2002]; *Matter of Garcia v New York City Probation Dept.*, 208 AD2d 475, 476 [1st Dept 1994]).

The petitioner "bears the burden of establishing bad faith or illegal reasons by competent evidence . . . [and] [s]peculative and/or conclusory allegations of bad faith [or] improper motive . . . are insufficient to meet this burden" (*Matter of Robinson v Health & Hosps. Corp.*, 29 AD3d 807, 809 [2d Dept 2006] [internal quotation marks omitted and alterations in original], *appeal dismissed* 7 NY3d 845 [2006]; *see also Smith v New York City Dept. of Correction*, 292 AD2d at 198). Thus, when a probationary employee challenges his or her termination in an article 78 proceeding, the function of the court "should not be to 'second guess' . . . [but] is simply to determine if petitioner has shown bad faith on the part of the respondent" (*Matter of Soto v Koehler*, 171 AD2d 567, 569 [1st Dept 1991], *lv denied* 78 NY2d 855 [1991]). Applying these principles, petitioner has failed to raise a material issue as to bad faith or any other improper reason for his discharge and the petition was correctly dismissed (*see Matter of Green v New York City Hous. Auth.*, 25 AD3d 352, 353 [1st Dept 2006]).

While petitioner contends that respondents improperly terminated his probationary employment for some misconduct surrounding Echevarria's death, other than providing conclusory assertions, he presents nothing that would support an inference that the termination was for an illegal reason or that the investigation which led to it was conducted in bad faith (*see Matter of Phucien v City of N.Y. Dept. of Corr.*, 129 AD3d 505, 506 [1st Dept 2015] ["Petitioner's unsupported assertions that respondent Department of Correction improperly terminated his probationary employment are insufficient to satisfy his burden of establishing that his dismissal was in bad faith"]; *see also Matter of Lane v City of New York*, 92 AD3d 786, 787 [2d Dept 2012], *lv denied* 19 NY3d 810 [2012]; *Walsh v New*

*York State Thruway Auth.*, 24 AD3d 755, 757 [2d Dept 2005]). "At best, petitioner merely raise[s] factual disputes [as to whether the alleged determination that he engaged in misconduct with respect to Echevarria's death is correct] that do not entitle [him] to a hearing" (*Matter of Bradford v New York City Dept. of Correction*, 56 AD3d 290, 291 [1st Dept 2008], *lv denied* 12 NY3d 711 [2009]).The majority finds that petitioner "present[s] a substantial issue of bad faith—namely, whether [his] discharge was unrelated to work performance—sufficient to require a denial of the pre-answer motion to dismiss." The majority also states that petitioner established a factual predicate for his claim that his termination was arbitrary and capricious, and in bad faith, by virtue of his allegations, which respondents did not attempt to refute, that he acted according to DOC rules, which required him to report the incident to his supervisor, that he was obligated to follow his supervisor's orders telling him not to do anything, that he could not leave his post, and that he fully cooperated with the investigation of Echevarria's death.

However, respondents were not obligated to provide a statement of reason for the discharge of a probationary employee or to conduct a hearing. Furthermore, contrary to the view of the majority, respondents' motion to dismiss for failure to state a cause of action does not present a "unique procedural scenario" and respondents' submissions established that petitioner failed to allege any facts from which the court could conclude that his termination was in bad faith, or otherwise unlawful.

The majority's position rests on the flawed premise that if petitioner is correct that DOC's finding of misconduct (after an internal investigation) was in error because he was just following orders and DOC protocol, then the termination of his probationary employment would have been in bad faith. However, even assuming, for the purposes of respondents' motion to dismiss, that respondents were somehow mistaken when they found, after conducting an extensive investigation, that petitioner's role in Echevarria's death constituted misconduct, petitioner has not raised any factual issue as to whether that determination was made in bad faith or that he was terminated for an improper reason (*see Matter of Turner v Horn*, 69 AD3d 522, 523 [1st Dept 2010] [proceeding properly dismissed where "petitioner submitted evidence challenging the investigators' conclusion, but did not submit any evidence raising a substantial issue as to respondents' bad faith in investigating the alleged violation or in deciding to terminate her employment"]; *Matter of Lane v City of New York*, 92 AD3d at 786-787 [2d

Dept 2012] [cross motion to dismiss properly granted where "(the petitioner's) claims that the Command Discipline issued for his violation of departmental rules and regulations was erroneous, and that his use of force in dealing with inmates was justified, were insufficient to establish that his employment was terminated in bad faith"]; *Matter of Green v New York City Hous. Auth.*, 25 AD3d at 352-353 [order directing a hearing as to the propriety of the challenged determination was reversed and the petition denied insofar as it challenged the petitioner's termination, where the petitioner was terminated after the respondent investigated complaint and found that the petitioner had assaulted another employee; while the petitioner showed that the respondent's determination may have been mistaken, she raised no issue as to whether it was made in bad faith]).

The majority believes that petitioner acted appropriately. However, even were we to consider petitioner's self-serving justifications for his failure to obtain medical care for Echevarria, the record amply demonstrates, at a minimum, petitioner's gross indifference to his charge. Although petitioner reported Echevarria's condition to Pendergrass on multiple occasions, each time the captain told him to do nothing and return to his post, petitioner obeyed without protest, placing his personal concerns as to potential consequences of disobeying Pendergrass's unlawful and unreasonable orders over the well-being of Echevarria.

Petitioner's selective reading of DOC rules, focusing only on reporting requirements to support his assertions that he did not engage in misconduct, which the majority accepts, mischaracterizes the overall import of the rules, which make inmate safety and medical care the priority of every correction officer. DOC rule 2.30.010 provides as follows: "Correction Officers shall be held responsible for the safety, sanitation, and security of their posts, for the proper care, custody, control and treatment of inmates and the enforcement of the Rules and Regulations of the Department and the command." Rule 7.10.040 provides that "[w]henever an inmate complains or appears to be injured or sick, *prompt action* shall be taken to ensure that the inmate is examined by authorized medical personnel" (emphasis added). Although a Directive from DOC, effective February 21, 1997, provides that a correction officer who receives an injury complaint from an inmate shall notify the area supervisor as soon as possible, the directive also provides that "[i]n the event that the urgency of the situation precludes such notification because a delay obtaining medical treatment

could cause a worsening of the inmate's condition, the notification shall be made as soon as possible, while the inmate is either being treated or immediately thereafter." Thus, it is clear that DOC regulations mandate that ensuring inmate safety, rather than prompt reporting, is a correction officer's primary duty.

Contrary to the view of the majority, DOC rules 6.10.030 and 7.05.090, which respectively require a correction officer to inform his or her captain that an inmate may harm himself or has suicidal tendencies, do not justify petitioner's failure to seek aid for Echevarria. Petitioner was told by Echevarria that he had already swallowed the "soap ball," not that he *may* swallow it, after which petitioner personally observed Echevarria's condition deteriorating.

Petitioner was also told by a pharmacy technician that medical attention was needed. Still, petitioner did not obtain medical care for Echevarria during his shift, choosing instead to blindly follow Pendergrass's orders rather than contact Pendergrass's superiors or the medical unit to report the obvious threat to Echevarria's well-being. Most significantly, after his shift ended, at which time he was no longer bound to his post or under the control of Pendergrass, petitioner still failed to alert anybody in a supervisory or medical role as to Echevarria's deteriorating condition or to seek any help for him. He just went home, knowing that Echevarria had not received any medical help. That others may also have been aware of Echevarria's worsening condition and also failed to obtain medical care for him does not absolve petitioner of responsibility for his own conduct. He was the officer that was directly responsible for Echevarria's care and safety and should have obtained the medical assistance that he knew Echevarria so desperately needed, notwithstanding Pendergrass's orders to the contrary.

While neither Pendergrass nor petitioner were indicted by the District Attorney's office that investigated, and only Pendergrass was indicted by the U.S. Attorney, we do not have to speculate as to whether petitioner was not indicted because the U.S. Attorney needed his eyewitness testimony to prosecute Pendergrass. Even assuming that petitioner's conduct did not rise to the level of criminal liability, his not being indicted has no bearing in this article 78 proceeding. Petitioner has not met his burden of establishing that his conduct, as he himself describes it, could not support the dismissal of a probationary employee—who may be dismissed for any reason or no reason at all—except for an illegal reason or in bad faith.

*Matter of Higgins v La Paglia* (281 AD2d 679 [3d Dept 2001], *appeal dismissed* 96 NY2d 854 [2001]) and *Matter of Ramos v Department of Mental Hygiene of State of N.Y.* (34 AD2d 925 [1st Dept 1970]), cited by the majority, are inapposite. In *Higgins*, a hearing was directed regarding the termination of a probationary correction officer where an issue was raised as to good faith because of, among other things, conflicting evaluation reports and allegations by the petitioner that he, unlike other newly hired correction officers, was not afforded academy training (281 AD2d at 681). In *Ramos*, a hearing was directed where the petitioner claimed that her dismissal was not the result of the failure to perform her duties satisfactorily but was due to a personality conflict with a supervisor (34 AD2d at 925). In contrast, here petitioner alleges that upon information and belief he was terminated for alleged job-related misconduct surrounding the death of an inmate, not for a personality conflict unrelated to his work, and he has not produced any performance evaluations or other evidence that would support his claim that he was discharged in bad faith.

In sum, the death of an inmate while in custody is a very serious matter and petitioner's assertion that he did not commit any misconduct because he followed reporting protocol and Pendergrass's orders is, in and of itself, insufficient to raise a substantial issue as to whether the termination of his probationary employment was in bad faith or otherwise improper. Since World War II, the "just following orders" or "Nuremberg" defense has not occupied a valid place in our jurisprudence and petitioner's conduct, under any standard, cannot be deemed appropriate. Although a correction officer must usually follow a superior's orders, there are situations where a reasonable decision maker could conclude that the officer should not have done so. This is such a case, where petitioner was told by Echevarria that he had ingested a toxic substance and needed medical care, personally observed Echevarria's prolonged distress and was told by a pharmacy technician that medical help was required, and nevertheless chose to follow Pendergrass's orders not to get help, even though the orders were objectively unreasonable in that they clearly violated Echevarria's constitutional rights and imperiled his health and safety. Indeed, given the ongoing criticism of the treatment of inmates on Rikers Island, one can only imagine what the reaction would have been had DOC accepted petitioner's "just following orders" defense and retained him, continuing the misguided practice of not holding responsible officers accountable.

Accordingly, the judgment denying the petition and granting

respondents' cross motion to dismiss the proceeding should be affirmed.